# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

JOHN T. VALENTE,

        Plaintiff,                :        Case No. 3:08-cv-225


     -vs-                           Magistrate Judge Michael R. Merz
                              :

UNIVERSITY OF DAYTON,

        Defendant.

## DECISION AND ORDER ON DEFENDANT'S SUMMARY JUDGMENT MOTION

This case is before the Court on Defendant's Motion for Summary Judgment (Doc. No. 123), Plaintiff's Response in Opposition (Doc. No. 137) and Defendant's Reply Memorandum in Support (Doc. No. 141).

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56.  On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970).  Nevertheless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for

summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) (emphasis in original). Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment asserting that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed. R. Civ. P. 50). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989). If, after sufficient time for discovery, the opposing party is unable to demonstrate that he or she can do so under the *Liberty Lobby* criteria, summary judgment is appropriate. *Id.* The opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249-50, 106 S. Ct. at 2510-11 (citations omitted). "The mere possibility of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)(quoting *Gregg v. Allen-Bradley Co.,* 801 F.2d 859, 863 (6th Cir. 1986). Therefore a court must make a preliminary assessment of the evidence, in order to decide whether the plaintiff's evidence concerns a material issue and is more than de minimis. *Hartsel v. Keys*, 87 F.3d 795 (6th Cir. 1996). "On summary judgment," moreover, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d 176 (1962). Thus, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249, 106 S. Ct. at 2510.

The moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex,* 477 U.S. at 323; *see also, Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (citation omitted). The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Alexander v. Caresource,* 576 F.3d 551 (6th Cir. Ohio 2009), citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.,* 276 F.3d 845, 848 (6th Cir. 2002). If the moving party meets this burden, the nonmoving party must go beyond the pleadings to show that there is a genuine issue for trial. *Matsushita,* 475 U.S. at 587; *Martin v. Ohio Turnpike Comm'n.,* 968 F.2d 606, (6th Cir. 1992), *cert. denied,* 506 U.S. 1054, 113 S. Ct. 979, 122 L.Ed.2d 133 (1993).

In ruling on a motion for summary judgment (in other words, determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Interroyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied,* 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, a court is entitled to rely only upon those portions of the verified pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.,* 260 F.3f 574, 581 (6th Cir. 2001). "Materiality is determined by the substantive law claim." *Boyd v. Baeppler,* 215 F.3d 594, 599 (6th Cir. 2000). An issue is genuine

if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.,* 14 F.3d 1143, 1148 (6th Cir. 1994), quoting *Anderson,* 477 U.S. at 248. Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala,* 205 F.3d 937, 943 (6th Cir. 2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Simmons-Harris v. Zelman,* 234 F.3d 945, 951 (6th Cir. 2000), *rev'd on other grounds,* 536 U.S. 639 (2002). Thus, a factual dispute which is merely colorable or is not significantly probative will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States,* 991 F.2d 292, 296 (6th Cir.), *cert. denied* 510 U.S. 976 (1993); *see also, Int'l Union United Auto., Aerospace & Agriculture Implement Workers of America v. BVR Liquidating, Inc.,* 190 F.3d 768, 772 (6th Cir. 1999), *cert. denied* 529 U.S. 1076 (2000).

The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street,* 886 F.2d at 1479. A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the [non-moving party]." *Anderson,* 477 U.S. at 252. If, after sufficient opportunity for discovery, the non-moving party is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.,* 477 U.S. at 322-23. "The failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion." *Alexander v. Caresource,* 576 F.3d 551 (6th Cir. Ohio 2009), quoting *Everson v. Leis,* 556 F.3d 484, 496 (6th Cir. 2009) (citing *Skousen v. Brighton High School*, 305 F.3d 520, 528 (6th Cir. 2002)).

**Subject Matter Jurisdiction and Governing Substantive Law**

This Court has subject matter jurisdiction of this dispute under 28 U.S.C. § 1332 because the parties are of diverse citizenship; the Court's subject matter jurisdiction is not disputed.

A federal court exercising supplemental or diversity subject matter jurisdiction over state law claims must apply state substantive law to those claims. 28 U.S.C. §1652; *Gasperini v. Center for Humanities, Inc.*, 528 U.S. 415, 427, n. 7 (1996); *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), overruling *Swift v. Tyson*, 41 U.S. 1 (1841)(Story, J., holding that "the laws of the several states" in the Judiciary Act of 1789 means only the statutory law of the States). In applying state law, the Sixth Circuit follows the law of the State as announced by that State's supreme court. *Ray Industries, Inc. v. Liberty Mut. Ins. Co.*, 974 F.2d 754, 758 (6th Cir. 1992); *Miles v. Kohli & Kaliher Assocs.,* 917 F.2d 235, 241 (6th Cir. 1990). "Where the state supreme court has not spoken, our task is to discern, from all available sources, how that court would respond if confronted with the issue." *Id.; In re Akron-Cleveland Auto Rental, Inc.,* 921 F.2d 659, 662 (6th Cir. 1990); *Bailey v. V & O Press Co.*, 770 F.2d 601 (6th Cir. 1985); *Angelotta v. American Broadcasting Corp.,* 820 F.2d 806 (1987). The available data to be considered if the highest court has not spoken include relevant dicta from the state supreme court, decisional law of appellate courts, restatements of law, law review commentaries, and the "majority rule" among other States. *Bailey*, 770 F.2d at 604. "Where a state's highest court has not spoken on a precise issue, a federal court may not disregard a decision of the state appellate court on point, unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Puckett v. Tennessee Eastman Co.*, 889 F.2d 1481, 1485 (6th Cir.1989); *accord Northland Ins. Co. v. Guardsman Products, Inc.*, 141 F.3d 612, 617 (6th Cir.1998). This rule applies regardless of whether the appellate court decision is published or unpublished. *See Talley v. State Farm Fire & Cas. Co.*, 223 F.3d 323, 328 (6th Cir.2000); *Puckett,* 889 F.2d at 1485. *Ziegler v. IBP Hog Market*, 249 F.3d 509, 517 (6th Cir. 2001).

In preliminary injunction decisions in this and Plaintiff's prior case, the Court analyzed the

relationship between a law student and a private law school at which he or she had matriculated as contractual in nature, relying on general law. (Decision and Order, Doc. No. 35, citing Fuller, The Morality of Law, at 127-29 (1964 ed.); Note, "Private Government on the Campus – Judicial Review of University Expulsions," 72 Yale L. J.1362 (1963)).

The parties have now cited Ohio law to the same effect. *Mahalati v. Ohio State Univ.*, 2007 Ohio 3856, 2007, ¶ 11, Ohio Misc. LEXIS 251 (Ohio Court of Claims, May 10, 2007), citing *Behrend v. State,* 55 Ohio App. 2d 135, 139, 379 N.E. 2d 617 (Ohio App. 10th Dist. 1977); *Waliga v. Board of Trustees of Kent State Univ.*, 1984 Ohio App. LEXIS 11690 (Ohio App. 8th Dist. Nov. 30, 1984). The Court accordingly applies Ohio contract law to determine the rights and obligations of the parties.

In denying preliminary injunctive relief in this case, the Court found that the University of Dayton School of Law[1] ("UDSL") had at least substantially complied with the terms of its contract with Mr. Valente and that, under Ohio law, "substantial compliance with the terms of a contract will excuse a claim of breach by the other party." (Decision and Order, Doc. No. 35, citing *Green v. Jackson Nat'l Life Ins. Co.*, 195 Fed. Appx. 398, 2006 U.S. App. LEXIS 21239 (6th Cir. 2006); *U.S. Bank, N.A. v. Stewart*, 2007 Ohio 5669, 42 (Ohio App., 2nd Dist Oct. 19, 2007), citing *Ohio Farmers' Ins. Co. v. Cochran*, 104 Ohio St. 427, 135 N.E. 537 (1922), for the "long and uniformly settled rule as to contracts requires only a substantial performance in order to recover upon such contract. Merely nominal, trifling, or technical departures are not sufficient to breach the contract." *Id.* at paragraph two of the syllabus.)

In the instant Motion, UDSL relies on the doctrine of substantial compliance, but Plaintiff

---

[1]The Defendant in this case is the University of Dayton which is apparently the *sui juris* entity here. In all respects in this case, the University acted through its Law School. There is no contention that the acts of the Law School do not constitute acts of the University for purposes of this case.

asserts it should not apply. Plaintiff relies on *Alexander v. Buckeye Pipeline Co.*, 53 Ohio St. 2d 241, 374 N.E. 2d 146 (1978), but that case has nothing to do with the doctrine of substantial compliance, but rather with the parol evidence rule. Plaintiff cites *Inland Refuse Transfer Co. v. Browning-Ferris Industries of Ohio, Inc.,* 15 Ohio St. 3d 321, 474 N.E. 2d 271 (1984), which, instead of addressing substantial compliance, is again about interpretation of express written agreements. Finally, Plaintiff relies on *The Farmers National Bank v. The Delaware Insurance Company*, 83 Ohio St. 309, 94 N.E. 834 (1911), which again is about ambiguity in construing written contracts, and not about substantial compliance.

In contrast to his position on substantial compliance, but responding to the same argument by UDSL, Plaintiff asserts this "Court should apply of [sic] a fundamental fairness standard or the principle of [sic] embodied in the concept of due process," citing *Clayton v. Trustees of Princeton Univ.*, 608 F. Supp. 413 (D.N.J. 1985). In his earlier opinion on summary judgment Judge Ackerman decided the New Jersey courts would follow a substantial compliance standard. In the cited opinion, his decision on the merits, Judge Ackerman not that subsequent New Jersey decisions held that the test was whether a student had been treated with fundamental fairness in a disciplinary proceeding, but implied that test was less strict than substantial compliance. In *Boehm v. Univ. Pa. School of Veterinary Medicine*, 392 Pa. Super. 502, 573 A. 2d 575 (Pa. Super. Ct. 1990), a case relied on by both parties, here substantial compliance with the school's adopted procedures for discipline was found to be sufficient.

The Court concludes that Ohio courts would allow the defense of substantial compliance in a private university student discipline case and might[2] go further to uphold discipline which had been imposed in a fundamentally fair manner even if it did not substantially comply with the

---

[2]No Ohio law is cited on this point by the parties. The law cited from other jurisdictions about the reluctance of courts to interfere with the internal affairs of private voluntary associations in general and unversities in particular would likely be persuasive to Ohio courts.

university's adopted procedure.  In other words, the "due process" standard argued for by the Plaintiff himself is less restrictive than substantial compliance.[3]

# Analysis

### Breach of Contract Claims

Plaintiff contends that UDSL violated its contract with him in the following ways:

1.    Breaches of Explicit Provisions of the Honor Code:

    1.    Failure to inform Plaintiff orally at the outset of the disciplinary proceedings of the alleged violations of which he was eventually found guilty.

    2.    Failure to permit Plaintiff to impeach the witnesses against him.

    3.    Basing findings of fact and guilt upon material other than evidence presented at the disciplinary hearing.

    4.    Considering violations different from or in addition to those charged.

    (Response in Opposition, Doc. No. 137, at 4-13.)

2.    Failure of the University to Comply with its Substantive Rule on the Quiet Period.  *Id.*  at 13-21.

3.    Breach of the Honor Code and the Implicit Contract Between Plaintiff and the University by

    i.    Failing to fully investigate the allegations or failing to report exculpatory evidence.

    ii.    Failing to furnish the Plaintiff with an accurate summary of the substance of the

---

[3]Throughout these proceedings, Plaintiff has seemed to equate "due process" with the strict demands of the Fourteenth Amendment in criminal cases.  Of course, due process applied in civil situations is much less demanding.

witnesses' testimony.

iii. Failing, at the commencement of the disciplinary hearing, to inform the Plaintiff of the alleged violations of which he was eventually found guilty.

iv. Failing to properly apply the facts found by the Honor Council Panel to the sections of the Honor Code alleged to have been violated; or, in the alternative, failing to interpret the Honor Code in light of the principles of due process, as required by the Honor Code; or. in the alternative, failing to interpret the Honor Code to prevent an absurd result.

v. Failing to allow the Plaintiff to impeach witnesses based upon other HonorCouncil proceedings.

vi. Failing to base findings of facts ofthe disciplinary hearing upon evidence presented at the disciplinary hearing

vii. Failing to prove beyond a reasonable doubt, each violation of the Honor Code charged; or, in the alternative, the Plaintiff was presumed guilty and had to prove his innocence.

viii. Failing to obey Honor Code procedures when it considered violation(s) that were different from, or in addition to, those charged.

ix. Failing to provide the Plaintiff his requested information, including previous opinions that were to be placed in a file, held by the President of the Honor Council, and made available only for precedential value at future Honor Council proceedings.

(Response in Opposition, Doc. No. 137, at 22-23, quoting Complaint at 13-14.)

These categories of asserted breaches of contract are dealt with *seriatim* below.

**1.      Asserted Breaches of the Honor Code Procedural Rules:**

1.      Plaintiff asserts that the Honor Council President failed, at the commencement of the disciplinary proceedings, to comply with the provisions of Honor Code requiring that she advise Mr.

Valente of the nature of the alleged violation by explaining what actions were at issue and how they constituted violations of the specific sections of the Honor Code (Response in Opposition, Doc. No. 137, at 6-7.) In reply, UDSL quotes verbatim what the Honor Council President, Kathryn Bowling, said ((Doc. No. 141 at 2). The Court concludes that there is no genuine issue of material fact about what Ms. Bowling said[4] and as a matter of law what she said constitutes substantial compliance with the Honor Code.

2.      Plaintiff contends that he was not permitted to impeach two of the witnesses against him by placing into evidence that one of them, the accuser, had been granted immunity from discipline for his own actions in connection with Mr. Valente's disciplinary violations and the other, the alleged co-conspirator, was awaiting imposition of a sanction. Plaintiff points to that portion of § 5.06 of the Honor Code which provides that "Each party shall have the right . . . to impeach any witness regardless of which party first called the witness. . . ."

In its Reply, UDSL notes that the Honor Council President is given the role of admitting and excluding evidence at Honor Council hearings. The evidence in question was excluded on the basis that it would violate the confidentiality rights of the other two students in disciplinary proceedings, a right on which Plaintiff himself has insisted in the course of these proceedings and to protect which the Court has permitted a number of filings under seal.

Ms. Bowling's ruling was a reasonable interpretation of the Honor Code and one which Mr. Valente should have anticipated. The right to impeach witnesses created in the Honor Code is not on its face a right to impeach them with anything the impeaching examiner considers material. Even in a criminal trial under the Federal Rules of Evidence extrinsic evidence of impeaching conduct by a witness is excluded (Fed. R. Evid. 608(B)), albeit on different grounds from protecting the witness'

---

[4]As Defendant points out, the Honor Council proceedings were recorded and have been transcribed and attached to the Motion as Exhibit 4.

privacy interests.

The Court concludes that there is no genuine issue of material fact about what happened at the Honor Council proceeding in this regard and concludes as a matter of law that Ms. Bowling's ruling was in substantial compliance with the Honor Code.

3.     Plaintiff complains that the Honor Code requires that "a decision that a violation has occurred must be based upon the evidence presented at the hearing," but that he was found to have violated the Quiet Period Rule which was "never placed into evidence at the disciplinary hearing." (Response in Opposition, Doc. No. 137, at 8-9.)

The Quiet Period Rule was entered in evidence as Defendant's Exhibit 8 at the preliminary injunction hearing. As stated in the Decision and Order Denying Preliminary Injunction,

> The rules of that Quiet Period [the December, 2007, period in question] were set forth in an email communication by the Registrar, Linda Cole, to all students on November 29, 2007 (DX 8). In pertinent part, the email reads:
>
> **The Quiet Period**
>
> The Quiet Period applies to all exams. AFTER you take the exam, you may not discuss the exam OR any legal concepts relating to the course with any member of the UDSL community, including classmates and professors, until after December 24, 2007. For example, you may NOT comment on how difficult the exam was, what concepts the exam covered, etc. If a discussion of the completed exam arises, you are to immediately remove yourself from the conversation.

(Doc. No. 35 at 4.) Mr. Valente does not dispute the content of the Quiet Period Rule (as opposed to its appropriate interpretation). Nor does he dispute that it was universally disseminated to UDSL students by email. Nor can there be any doubt that the charge as read by Ms. Bowling at the beginning of the hearing, which was completely consistent with written material from before that, encompassed receiving from another student the substance of criminal law examination questions after that student had taken the examination and passing those questions on to another student. As

best the Court understands this claimed violation of the student-University contract, it is that a copy of the Quiet Period Rule was not marked as an exhibit at the hearing. Given the ubiquitous distribution of the rule, the lack of any dispute about its content, and the clarity of the charges, the Court finds UDSL substantially complied with that portion of the Honor Code which requires that violations be based on evidence introduced in the hearing. The Quiet Period Rule is in the nature of a regulation which all law students knew about. It is akin to the Honor Code itself, which did not need to be introduced into evidence to support finding a violation.

4.      Finally, Plaintiff contends he was found guilty of accepting criminal law materials from a student he knew had taken the examination when he was charged with taking those materials and knowing that they were based on the examination (Response in Opposition, Doc. No. 137, at 10). He alleges that this amounts to finding him guilty of a different violation than the one with which he was charged.

The decision of the Honor Council panel avoided the question of whether Plaintiff knew the information he received from Student G was taken from the criminal law examination because it found that point was not necessary to its decision. In other words, the prosecutor's mentioning of that point of proof is like surplusage in an indictment: an extra fact which the prosecutor does not have to prove to win and which a defendant does not have to be prepared to defend against.

This is quite different from the situation in *Feldheimer v. Middlebury College*, 869 F. Supp. 238 (D. Vt. 1994), where a student was charged with rape and, without notice that it could happen, was found guilty of a different charge, "disrespect of persons." As the district court made clear in that case, defense against a charge of non-consensual sexual relations is quite pointed, as compared with the much more amorphous charge of disrespect of persons. In criminal parlance, the latter is not necessarily a lesser included offense of the former.

**2.      Failure of the University to Comply with its Substantive Rule on the Quiet Period.**

On its face, the Quiet Period Rule prohibits discussion by a person who has taken an examination of anything about that course with anyone else from the time the student takes the examination until December 24, 2007. On its face, it does not prohibit a student who has not taken the examination from listening to a student who has taken the exam say things about the exam, or, perhaps on a very literal reading of the rule, from discussing the examination with a student who has, since the prohibition on discussion is addressed to the student who has taken the examination. (I.e., on this reading, the discussion should not take place, but only the student who has taken the edxam has violated the Rule by being in the discussion.)  On its face, the Rule does not prohibit a student who has taken the examination from conveying written materials about the exam to others, since, a literalist might say, "writing" is not "discussing."

The quiet period was apparently adopted by UDSL to facilitate the open scheduling of examinations which allows students in the same course to take the exam at different times within the examination period. The Court is not advised of the pedagogical reasons for open examinations, but, if they were to be used, something like the Quiet Period Rule was obviously needed to enforce the UDSL Policy on Academic Dishonesty (See Doc. No. 123-2 at 16).

Plaintiff's point about the Quiet Period Rule, as the Court understands it, is that the Honor Council adopted an interpretation of the Rule – no student who has taken an examination can give anything related to the subject matter of that course to a student who has not yet taken the examination – which is inconsistent with an interpretation of the Rule which Mr. Valente claims to have obtained from Dean Lori Shaw at some unspecified time under which unannotated material could be passed along from one student to another without violating the Rule.

Because the case is at the summary judgment stage, the Court accepts Plaintiff's sworn assertion about what he heard from Dean Shaw (Affidavit, Doc. No. 137-1). This does not raise a

material issue of fact because Plaintiff was not found guilty of doing what he claims Dean Shaw said he could do. Rather, he accepted from Student G questions about advanced criminal procedure knowing that Student G had just taken that examination. This was no unannotated casebook, outline, or text prepared by Student G before the exam and unaltered after the exam; these were the specific questions Student G had just answered.

**3.     Additional Breaches of the Honor Code and the Implicit Contract Between Plaintiff and the University**

In this portion of his Response in Opposition, Plaintiff lists nine additional asserted breaches of contract which he claims still stand for trial because they are in the Complaint but were not addressed in the Defendant's Motion for Summary Judgment. The Court finds this section difficult to understand because it repeats many of the breaches dealt with above. Asserted additional breaches iii, iv, v, vi, and viii have been explicitly discussed and dealt with above. In fact the Defendant did move for summary judgment on all of Plaintiff's claims, contractual and non-contractual, and Plaintiff has come forward with no evidence at all on claims i, ii, vii, and ix.

Plaintiff contends generally that the question of whether UDSL substantially complied with its contractual requirements before suspending him is a question of fact for a jury to decide.  This appears to be because he confuses the questions of substantial compliance with interpretation of an ambiguous contract term (See Response in Opposition, Doc. No. 137, at 5-6.)

If the case were tried, it is undoubtedly correct that the ultimate question whether UDSL had prevailed on its substantial compliance/fundamental fairness defense would be for jury determination.  At the summary judgment stage, however, the question is whether UDSL has come forward with evidence of substantial compliance and whether Plaintiff has submitted any evidence

competent under Fed. R. Civ. P. 56 upon which a jury could find in his favor on that question.

In deciding this point, the Court relies on Fed. R. Civ. P. 65(a)(2) which provides in pertinent part "evidence that is received on the motion [for preliminary injunction] and that would be admissible at trial becomes part of the trial record and need not be repeated at trial. But the court must preserve any party's right to a jury trial." All of the evidence on the motion for preliminary injunction was evidence which would be admissible at trial: the Court conducted a two-day hearing in open court to which the Rules of Evidence were applied; no reliance was placed on uncross-examined affidavits.

The state of the evidence on the question of substantial compliance has not changed since the preliminary injunction hearing. That is to say, nothing submitted by the Plaintiff in opposition to the Motion for Summary Judgment creates a genuine issue of material fact on this point[5]. To put it another way, if the evidence now before the Court on this Motion were instead before the Court during a jury trial at the close of Plaintiff's case, the Court would be obliged to enter judgment as a matter of law in favor of the Defendant. The standard for judgment as a matter of law at the conclusion of the Plaintiff's case and on motion for summary judgment are the same. Fed. R. Civ. P. 50.

Although he does not use the term, Plaintiff appears to regard the Honor Code as a set of *malum prohibitum* regulations with prosecutors limited to strict interpretation and the procedural rigidity of criminal practice. On the contrary, academic cheating is *malum in se.* Academic institutions are chartered to award the most important credentials in contemporary society and society rightly demands that universities have a honest process for evaluating whether students are entitled to those credentials. That obligation is even higher for law schools, which award the degree

---

[5]The claims made in Plaintiff's Affidavit (Ex. 1 to Doc. No. 137) are discussed in detail below.

which is the *sine qua non* of admission to practice. Bar examinations and bar character committees are a thin defense against admission to practice of the unprepared and unethical. Law schools with their extended time period for evaluating students, must be a thicker defense. Law students who cheat on examinations are both academically and morally unfit for the practice of law and law schools must take social responsibility for defending the public against those who cheat.

By undertaking a course of university studies, a student enters into a contractual relationship with the university. The core term of that contract from the student's side is that he or she will earn academic recognition honestly. As many of the cases cited by Defendant argue, courts should be very slow to interfere with university discipline, particularly in the area of academic honesty. In this case Plaintiff got exactly what he contracted for by way of discipline: a student-run process with myriad due process protections, more confidentiality than any criminal defendant gets, and eventual judgment by a jury of peers.

The Court concludes The University is entitled to summary judgment on all Plaintiff's contractual claims against it.

## Non-Contractual Claims

In his Complaint, Plaintiff pleads claims for relief one, two, three, and four in the alternative. That is to say, he claims that the UDSL actions referred to therein constitute breach of the duty of good faith and fair dealing or breach of contract, or breach of the fiduciary relationship or breach of the general duty of care (Complaint, Doc. No. 2, at ¶¶ 59-62).

Defendant contends that duties arising out of a contract cannot alternatively form the basis of a tort claim under Ohio law, citing *Hamlin v. Ohio Builders & Remodelers, Inc.*, 196 F. Supp. 2d 572 (S.D. Ohio 2001), where Judge Sargus held that "under Ohio law, the existence of a contract action generally excludes a cause of action based upon the same conduct sounding in tort" *Id.* at 579, citing *Wolfe v. Continental Cas. Co.*, 647 F.2d 705 (6th Cir. 1981). *Wolfe* in turn relies on *Battista v. Lebanon Trotting Ass'n*, 538 F.2d 111 (6th Cir. 1976), and *Ketcham v. Miller,* 104 Ohio St. 372, 136 N.E. 145 (1922), which remain good law in Ohio.

## The Tort of Breach of the Duty of Good Faith and Fair Dealing

In contending that he has a separate claim for breach of the duty of good faith and fair dealing, Plaintiff relies first of all of *In re Commercial Money Center, Inc., Equipment Lease Litigation*, 603 F. Supp. 2d 1095 (N.D. Ohio 2009). There Judge O'Malley wrote:

> Initially, the Court finds it clear under Ohio law that a claim for breach of the covenant of good faith and fair dealing sounds in tort. See, e.g., *Staff Builders, Inc. v. Armstrong*, 37 Ohio St. 3d 298, 302, 525 N.E.2d 783 (1988); *Maxey v. State Farm Fire & Cas. Co.*, 569 F. Supp. 2d 720, 724 (S.D. Ohio 2008). Although the Ohio courts have not considered a case involving the precise circumstances presented here, the Court finds that Ohio courts have consistently treated bad faith claims as claims arising in tort--even when the bad faith claims relate to obligations arising from a contract (as is typical in insurance bad faith situations). See, e.g., *Staff Builders*, 37 Ohio St. 3d at 302; *Suver,* 11 Ohio St. 3d at 8; *Maxey,* 569 F.

Supp. 2d at 724.

*Id.* at 1107. However, in *Staff Builders*, the first case cited by Judge O'Malley, the Ohio Supreme Court held:

> Given that Aetna is the insurer for purposes of the contract, it is necessary to determine whether the jury verdict finding bad faith on the part of Aetna is sustainable. In *Hoskins v. Aetna Life Ins. Co.* (1983), 6 Ohio St. 3d 272, 276, 6 OBR 337, 341, 452 N.E. 2d 1315, 1320, this court stated:
>
>> "The liability of the insurer in such cases does not arise from its mere omission to perform a contract obligation, for it is well established in Ohio that it is no tort to breach a contract, regardless of motive. See, e.g., *Ketcham v.. Miller* (1922), 104 Ohio St. 372. Rather, the liability arises from the breach of the positive legal duty imposed by law due to the relationships of the parties. See *Battista [v.. Lebanon Trotting Assn.* (C.A. 6, 1976), 538 F. 2d 111, at 117-118]. See, also, *Saberton v.. Greenwald* (1946), 146 Ohio St. 414 [32 O.O. 454]. This legal duty is the duty imposed upon the insurer to act in good faith and its bad faith refusal to settle a claim is a breach of that duty and imposes liability sounding in tort."
>
> Accordingly, we hold that an insurer has a duty to act in good faith in the processing and payment of the claims of its insured. A breach of this duty will give rise to a cause of action in tort irrespective of any liability arising from breach of contract.

37 Ohio St. 3d at 302, quoted in full by Plaintiff at Doc. No. 137, 25. The very law he cites precludes Plaintiff's tort claim for breach of the duty of good faith and fair dealing: in suspending Plaintiff on the Honor Council's finding of cheating, UDSL was not an insurance company processing a claim of its insured. It is true that breach of the duty of good faith and fair dealing "sounds in tort," but it is not, under Ohio law, a separate duty owed by a law school to its students.

### Breach of Fiduciary Relationship

Plaintiff contends that, in addition to characterizing his relationship with the University as contractual, it should also be analyzed as fiduciary. Plaintiff's sole authority for this proposition is

*Schneider v. Plymouth State College*, 144 N.H. 458, 744 A. 2d 101 (1999). There the New Hampshire Supreme Court recognized a fiduciary relationship between a college and an adult student in the context of sexual harassment. Plaintiff offers no analogical situations in which the Ohio Supreme Court has recognized a fiduciary relationship. In the absence of any case law even suggesting the Ohio courts would recognize that the relationship of a law school to its adult students is fiduciary as respects allegations that the student cheated on an examination, this Court declines to recognize such a relationship.

## Negligence

Plaintiff claims that he has pled a number of general legal duties owed to him by Dean Shaw, the members of the investigative team, the President of the Honor Council, the members of the Honor Council, the "President"[6] of UDSL, UDSL's general counsel, and the President of the University. Of course, there is absolutely no evidence before the Court except what was presented at the preliminary injunction hearing as to how any of these persons performed their functions in the disciplinary process; Plaintiff took virtually no discovery in this case nor any perpetuation depositions from any of his many listed witnesses.

Aside from that point, however, the exceptions Plaintiff suggests would swallow the rule that contractual obligations must be sued upon in contract, not tort. None of these actors had any duty to Plaintiff which was allegedly breached except for duties imposed on them by their roles in carrying out the contractual relationship between the parties.

The Court concludes that Ohio courts would not recognize causes of action for negligence against the University of Dayton for the asserted negligence of its agents in performing their parts

---

[6]Presumably the reference is intended to be to the Dean of Law Schoo.

in the contractual relationship with Plaintiff.

## Failure to Train or Supervise

In his Fifth Claim for Relief, Plaintiff alleges that the University negligently failed to train or supervise the members of the investigative team, the President of the Honor Council, the members of the Honor Council, the "President" of UDSL, UDSL's general counsel, and the President of the University for or in the performance of their roles in the disciplinary process.

Defendant relies on *Bachtel v. Jackson*, 2009 Ohio 1554 (Ohio App. 10th Dist. Mar. 31, 2009) for the proposition that Ohio does not recognize a common law action for failure to train. Plaintiff correctly responds that in *Niskanen v. Giant Eagle, Inc.,* 122 Ohio St. 3d 486; 2009 Ohio 3626; 912 N.E.2d 595 (2009), the Ohio Supreme Court did recognize such a cause of action. *Niskanen* did not establish liability for negligent failure to train by a private actor, but recognized it as a pre-existing tort in Ohio.

There are two barriers, however, to Plaintiff's reliance on that theory in this case. In the first place, it is merely a particularization of his general negligence claim which the Court has already held cannot be maintained when the relationship between the parties is contractual in nature. Much more fundamentally, Plaintiff has presented no evidence of failure to train or supervise.

## Intentional Infliction of Emotional Distress

In recognizing the tort of intentional infliction of emotional distress in Ohio, the Ohio Supreme Court adopted Restatement of the Law 2d, Torts 2d, §46, and comment d to that section which reads:

It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam. See Magruder, Mental and Emotional Disturbance in the Law of Torts, 49 Harvard Law Review 1033, 1053 (1936).

*Yeager v. Local Union 20,* 6 Ohio St. 3d 369, 453 N.E. 2d 666 (1983), *abrogated by, Welling v. Weinfeld,* 113 Ohio St. 3d 464 (2007) [although *Yeager* has been abrogated by *Welling*, the proposition for which the Court cites *Yeager* herein was not disturbed by *Welling*].

In order to recover on an action for the intentional infliction of serious emotional distress four elements must be proved: 1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; 2) that the actor's conduct was so extreme and outrageous, that it went beyond all possible bounds of decency and that it can be considered utterly intolerable in a civilized community; 3) that the actor's actions were the proximate cause of the plaintiff's psychic injury; and 4) that the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable person can be expected to endure it. *Miller v. Currie*, 50 F.3d 373 (6th Cir. 1995); *Pyle v. Pyle,* 11 Ohio App. 3d 31, 34, 463 N.E.2d 98, 103 (Cuyahoga Cty. 1983) (citation omitted); *Bellios v. Victor Balata Belting Co.*, 724

F. Supp. 514, 520 (S.D. Ohio 1989).

The emotional distress required must be both severe and debilitating. *Paugh v. Hanks*, 6 Ohio St. 3d 72, 451 N.E. 2d 759 (1983). While expert medical testimony is not an absolute necessity in every case, many Ohio courts have dismissed claims for emotional distress by plaintiffs who never sought medical assistance. *Dickerson v. Int'l United Auto Workers Union*, 98 Ohio App. 3d 171, 648 N.E. 2d 40 (Cuyahoga Cty. 1994). A trial court may determine whether a complainant has stated a cause of action for tortious emotional distress by ruling whether the emotional injury alleged is serious as a matter of law. *Id.* (citation omitted). Thus a number of courts have rejected specific complaints as not causing severe or debilitating emotional distress. *Id., citing, Gagne, supra.* (sleeplessness, withdrawal, and "not the same person she was" is not of sufficient severity); *Jones v. Washington,* 67 Ohio App. 3d 176, 586 N.E. 2d 228 (Lucas Cty. 1990) (recurring nightmares did not constitute showing of sufficient psychic injury); *McCarthy v. Cleveland Hts.,* 65 Ohio App. 3d 216 (Cuyahoga Cty. 1989) (depression requiring psychological counseling following son's suicide was not sufficiently severe); *Lynn v. Allied Corp.,* 41 Ohio App. 3d 392, 536 N.E. 2d 25 (Cuyahoga Cty. 1987) (distraught and hysterical feelings, crying, and elevated blood pressure not sufficiently serious).

The Sixth Circuit has recognized the propriety of applying this standard on summary judgment:

> To the extent that [plaintiff] suggests a district court judge cannot rule that, as a matter of law, certain conduct does not rise (or sink) to the extreme and outrageous level required to state a claim for intentional infliction of emotional distress, she attempts to prove too much. It is well accepted that intentional infliction of emotional distress claims may entirely appropriately be dealt with on summary judgment or in a motion to dismiss. *See, e.g., Rogers v. Targot Telemarketing Servs.,* 70 Ohio App. 3d 689, 591 N.E. 2d 1332, 1333, 1336 (1990)(treating plaintiff's allegations that she was falsely promised continued employment with the intention of causing her to detrimentally rely on the assurances as insufficient to qualify as extreme or outrageous); *Baab v. AMR Serv. Corp.*, 811 F. Supp.

1246, 1270 (N.D. Ohio 1993)(stating that co-workers' display of photographs of scantily clad women and plaintiff's receipt of pornographic "sex toys" was not intolerable in a civilized society and therefore not extreme or outrageous).

*Miller v. Curie*, 50 F.3d 373 at 377-78 (6th Cir. 1995).  The United States Supreme Court stated in

*Consol. Rail Corp. v. Gottshall,* 512 U.S. 532, 114 S. Ct. 2396, 129 L.Ed.2d 427 (1994):

> Because the etiology of emotional disturbance is usually not as readily apparent as that of a broken bone following an automobile accident, courts have been concerned ... that recognition of a cause of action for [emotional] injury when not related to any physical trauma may inundate judicial resources with a flood of relatively trivial claims, many of which may be imagined or falsified ... .  The incidence and severity of emotional injuries are also more difficult to predict than those of typical physical injuries because they depend on psychological factors that ordinarily are not apparent to potential tortfeasors.

quoted with approval in *Dickerson, supra*.

Plaintiff's claim here for intentional infliction of emotional distress fails for the following reasons:

1.     No conduct alleged to have been engaged in by any person associated with Plaintiff's discipline would evoke the exclamation "outrageous" from any reasonable juror.

2.     Plaintiff has presented no evidence of any psychological injury, severe or not, stemming from his suspension. Primary evidence to the contrary has been his continued vigorous litigation of this case and ancillary litigation *pro se*.

3.     As with Plaintiff's other tort claims, he cannot use the acts which are alleged to constitute breach of contract to support a tort claim and he has not pled any acts outside the contractual relationship which would support such a claim.

**Promissory Estoppel/Negligent Misrepresentation/Detrimental Reliance**

Plaintiff enumerates these three concepts as causes of action seven, eight, and nine, but pleads them altogether (Complaint, Doc. No. 2, at ¶¶ 64-65). It is completely unclear from the Complaint what negligent misrepresentations or what promises he is relying on. In his Response in Opposition, he seems to be relying solely on his remembered communication from Dean Shaw, but that communication was neither an unambiguous promise nor a negligent misrepresentation.

In order to give rise to action for promissory estoppel in Ohio, promises must be clear and unambiguous. *Kasuri v. St. Elizabeth Hospital,* 897 F.2d 845 (6th Cir. 1990), following *Cohen & Co. v. Messina*, 24 Ohio App.3rd 22, 492 N.E.2d 867, 872 (Cuyahoga Cty. 1985). In Ohio, the elements necessary to establish a claim for promissory estoppel are: (1) a clear and unambiguous promise; (2) reliance upon the promise by the promisee; (3) reliance by the promisee that is both reasonable and foreseeable; and (4) injury to the promisee as a result of the reliance. *Weiper v. W.A. Hill & Assocs.*, 104 Ohio App. 3d 250, 661 N.E. 2d 796 (Ohio App. 1st Dist. 1995).

As to negligent misrepresentation, Defendant cites *Delman v. City of Cleveland Heights*, 41 Ohio St.3d 1, 534 N.E.2d 835 (1989), where the Ohio Supreme Court held

> The elements of negligent misrepresentation are as follows: "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." (Emphasis added.) 3 Restatement of the Law 2d, Torts (1965) 126-127, Section 552(1), applied by this court in *Gutter v. Dow Jones, Inc.* (1986), 22 Ohio St. 3d 286, 22 OBR 457, 490 N.E. 2d 898, and *Haddon View Investment Co. v. Coopers & Lybrand* (1982), 70 Ohio St. 2d 154, 24 O.O. 3d 268, 436 N.E. 2d 212

*Id.* at 837.

Plaintiff claims that at some unspecified time, Dean Shaw told him that a student who had completed an examination could pass "study aids" along to a student who had not yet taken the

examination so long as those study aids were in no way annotated to reflect the content of the examination. Assuming as we must for purposes of summary judgment that Dean Shaw did indeed tell that to Plaintiff, it constituted her interpretation of the Quiet Period Rule. She did not promise that an Honor Council panel might interpret the Quiet Period Rule more strictly, nor did she represent that past Honor Council panels had interpreted the rule in the same manner she did. And it is inconceivable that Plaintiff could claim with a straight face that he relied on Dean Shaw's words when he accepted questions directly quoted from the Advanced Criminal Law from Student G, for no such reliance would be reasonable. There is no evidence that Dean Shaw was negligent in making this interpretation to Plaintiff, in particular because the more restrictive Honor Council panel interpretation had not yet happened. And Dean Shaw did not have a pecuniary interest in her transaction with Mr. Valente.

## Fraud and Scheme to Defraud

In causes of action ten and eleven, Plaintiff alleges the Defendant engaged in fraud and/or a scheme to defraud (Complaint, Doc. No. 2, at ¶¶ 66-71).

The elements of an action in actual fraud in Ohio are (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance. *Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St. 3d 54, 514 N.E. 2d 709 (1987), citing *Burr v. Stark Cty. Bd. of Commrs.*, 23 Ohio St. 3d 69, 491 N.E. 2d 1101, ¶2 of the syllabus (1986); and *Cohen v. Lamko, Inc.*, 10 Ohio St. 3d 167, 462 N.E. 2d 407 (1984).

Plaintiff cannot prevail on his tenth and eleventh causes of action for at least the following reasons:

1.   He has offered absolutely no proof of fraudulent intent on the part of any person acting on behalf of UDSL in his disciplinary process.

2.   Many of the allegedly fraudulent statements of fact are pled as promises.

3.   Once again, contractual claims cannot be recovered on in tort in the alternative.

## Civil Conspiracy

In his twelfth cause of action, Plaintiff essentially alleges that all of the University of Dayton actors involved in his case, including even President Daniel Curran, conspired against him (Complaint, Doc. No. 2, ¶¶ 72-88.)

In Ohio, a civil conspiracy consists of the following:  (1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy.  *Universal Coach v. NYC Transit Authority,* 90 Ohio App. 3d 284, 629 N.E. 2d 28 (Cuyahoga Cty.,1993), citing *Minarik v. Nagy,* 8 Ohio App. 2d 194, 26 Ohio Op. 2d 359, 193 N.E. 2d 280 (1963).   The requirement of an independent unlawful act is confirmed in *Williams v. Aetna Fin. Co.*, 83 Ohio St. 3d 464, 475 (1998)*,* citing *Gosden v. Louis,* 116 Ohio App. 3d 195, 219, 687 N.E. 2d 481, 496 (1996).   A civil conspiracy under Ohio law consists of a "malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages."  *Kenty v. Transamerica Premium Ins. Co*., 72 Ohio St. 3d 415, 419, 650 N.E. 2d 863 (1995), quoting *LeFort v. Century 21-Maitland Realty Co*., 32 Ohio St. 3d 121, 512 N.E. 2d 640 (1987) citing *Minarik, supra.  Williams v. Aetna Fin. Co.*, 83 Ohio St. 3d 464, 475 (1998).

A corporation cannot conspire with its own agents or employees. Where all defendants, allegedly co-conspirators, are members of the same collective entity, there are not two separate "people" to form a conspiracy, following *Doherty v. American Motors Corp.*, 728 F.2d 334 (6th Cir. 1984)(antitrust case). *Hull v. Cuyahoga Valley Bd. of Ed.*, 926 F.2d 505 (6th Cir. 1991)7; *Steptoe v. Savings of America*, 800 F. Supp. 1542 (N.D. Ohio 1992); *Rennick v. Champion Int'l. Corp.,* 690 F. Supp. 603 (S.D. Ohio 1987); *Kerans v. Porter Paint Co., Inc.*, 656 F. Supp. 267 (S.D. Ohio 1987), *aff"d,* 866 F.2d 431 (6th Cir. 1989); *Givan v. Greyhound Lines, Inc.*, 616 F. Supp. 1223 (S.D. Ohio 1985).

Aside from the intra-enterprise exception, Plaintiff cannot prevail on his claim for civil conspiracy because he has produced no evidence of conspiracy. In his Response in Opposition, he does not even suggest he has offered any evidence proving an agreement among these actors, but merely notes that many different people were involved. That is insufficient even to plead conspiracy, much less to defeat summary judgment. See *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937, 1949-1950 ( 2009).

**Conclusion**

There are no genuine issues of material fact between the parties and Defendant is entitled to judgment as a matter of law. The Clerk will enter judgment dismissing the Complaint with prejudice.

January 4, 2010.

s/ **Michael R. Merz**
United States Magistrate Judge
